1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

GOODRICH & PENNINGTON
MORTGAGE FUND, INC., a Delaware
Corporation,

                              Plaintiff,

        vs.

CHASE HOME FINANCE, LLC,

                              Defendants.

CASE NO. 05cv636 (JLS)

**ORDER: DENYING
DEFENDANT'S MOTION TO
DISMISS IN PART**

        Presently before the Court are Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint [Doc. No. 62], Plaintiff's Opposition [Doc. No. 68], Defendant's Reply [Doc. No. 71], and Defendant's Surreply [Doc. No. 77.]  For the following reasons, the Court **DENIES** Defendant's motion to dismiss Plaintiff's first and second causes of action.

## BACKGROUND

### I.        G&P-Advanta Agreements

        Plaintiff Goodrich & Pennington Mortgage Fund, Inc. ("G&P") is an originator of home mortgage loans.  [Plaintiff's Second Amended Complaint ("SAC") ¶ 1.]  As a loan originator, G&P offered mortgage loans to the general public through third-party mortgage brokers and to a limited extent on a retail bases.  Defendant Chase Home Finance, formerly known as Chase Manhattan Mortgage Corporation ("Chase"), is engaged in the business of servicing mortgage loans and related

05cv636

1   banking services concerning mortgaged-backed securities in and for the County of San Diego.  [Id.

2   ¶ 2.]

3        Advanta Mortgage Corporation USA ("Advanta") previously purchased mortgage loans from

4   loan originators, such as G&P, in accordance with its Corporate Finance Program ("CFP").  Under

5   the CFP, Advanta "securitized" these loans by placing them into large pools and selling interests in

6   the pools to investors as mortgage-backed securities.  On or about February 11, 1997, Advanta agreed

7   to securitize some of G&P's loans and to "service" G&P's mortgage loans under its "Conduit

8   Agreements" with G&P.  "Servicing" mortgage loans involved collecting monies due from G&P's

9   borrowers and taking appropriate action in the event of a default.  [Id. ¶ 15-17.]

10       Advanta placed the loan pools into Advanta Trusts ("Trusts").  While in the Trusts, the loan

11  pools produced revenue for Advanta and G&P as the borrowers made monthly mortgage payments

12  of principal and interest.  In total, G&P participated in eight Advanta Trusts and expected to receive

13  residual cash flow payments from them pursuant to the Conduit Agreements.  [Id. ¶ 17.]

14       Specifically, under the CFP, G&P expected to receive two forms of "premiums" as

15  compensation for the loans: an initial premium and a deferred premium.  As borrowers made their

16  monthly mortgage payments, Advanta was required to pay G&P monthly income from the Advanta

17  Trusts.  The initial premium was an "up front" payment made upon the purchase and securitization

18  of the loan pools.  This initial premium amounted to a percentage of the expected residual value of the

19  loans.  In essence, the initial premium was an "advance" or "loan" made by Advanta to G&P that

20  enabled G&P to fund its ongoing loan origination operations.  [Id. ¶ 18.]

21       The deferred premium was based on performance of the loan pools over time.  This premium

22  constituted the excess residual cash flow of principal and interest that Advanta obtained from the

23  mortgage loans after certain expenses and costs.  Thus, the amount of deferred premium G&P received

24  directly correlated with Advanta's collection efforts.[1]  From February 1997 to February 2001, Advanta

25  and G&P conducted business under the Conduit Agreements, although G&P argues that Advanta's

26  performance under the agreements was not in compliance with its contractual obligations.  [Id. ¶¶ 18-

27

28       [1] G&P would later "repay" Advanta for the initial premium (advance), by letting Advanta
     deduct funds from the deferred premium payments it owed to G&P.  [Id. ¶ 18.]

19.]

## II.    Advanta-OCC Agreements & Advanta-Chase Agreements

On May 31, 2000, Advanta consented to the issuance of a Consent Order by the Office of the Comptroller of the Currency ("OCC") (hereinafter "OCC Consent Order").[2]  Pursuant to the OCC Consent Order, the Comptroller required Advanta and its subsidiaries to develop and implement certain policies, plans and procedures governing, among other things, its ongoing operations, capital levels, loan loss reserves, and residual asset valuations.  [SAC ¶ 5.]

On or about January 8, 2001, following the entry of the OCC Consent Order, Advanta entered into a Purchase and Sale Agreement with Defendant Chase.  G&P alleges that in the Purchase and Sale Agreement, Advanta agreed to sell some of its assets to Chase, including its real estate loans as well as any ownership interest it had in certain residual assets.  [Id. ¶ 6.][3]  The Purchase & Sale Agreement states that Chase agreed to:

> perform all of the obligations of [Advanta] under the Corporate Finance Agreements, including without limitation the security agreements . . . Such obligations include, without limitations, the obligations with respect to the following: to make payments to the sellers under the Corporate Finance Agreements or their successors in interest (the 'Sellers'); to service the mortgage loans sold subject to such agreements; to maintain reserves for the Sellers; to provide monthly reports and other information to the Sellers (including access to servicing and accounting records and personnel); to maintain confidentiality with respect to information related to the Sellers[.]

[Id. ¶ 11.]

On or about February 27, 2001, shortly after Advanta entered into the Purchase and Sale Agreement with Chase, Advanta entered into an agreement with the OCC ("OCC Agreement") in furtherance of the prior OCC Consent Order provisions.  [Id. ¶¶ 8-9.]  The OCC Agreement stated that the OCC had found Advanta to be in "troubled condition," and subjected Advanta to certain requirements.  It stated:

---

[2]  The Office of the Comptroller of the Currency ("OCC"), a bureau of the United States Department of the Treasury, regulates, charters, and supervises all national banks.  Comptroller of the Currency of Administrator of National Banks, US Department of Treasury, http://www.occ.treas.gov/aboutocc.htm; [Pl.'s Opp. at 4.]

[3]  G&P alleges that Chase has repeatedly refused to disclose a full and complete copy of this Purchase and Sale Agreement and have only provided portions of it.  [Id. at ¶ 6.]

> Effective immediately, the Bank [Advanta] agrees that it will not enter into, nor commence any new business activities and/or product lines (including the origination of new mortgage loans after the closing on the Purchase and Sale Agreement [with Chase]) without the prior written approval of the Deputy Comptroller.

The OCC Agreement also stated:

> Pursuant to the terms of this Purchase and Sale Agreement, Advanta Corporation has agreed to sell certain assets, including the real estate loans owned by the Bank as well as the Bank's ownership interests in certain residual assets, to Chase Mortgage.  The closing is expected to occur on or before February 28, 2001.

[Id. ¶¶ 8-10.]

G&P alleges that this OCC Agreement reveals that: (1) the OCC pushed Advanta to exit the loan origination and secondary market, including servicing activities; (2) upon Advanta's exit of from this market, Advanta sold Chase its real estate loans and its residual interest to Chase; and (3) as a result, Chase remains liable to G&P for Advanta's unmet contractual obligations to G&P.  [Id. ¶¶ 10-11.]

On February 28, 2001, the day after the OCC Agreement, Advanta and Chase entered into a second agreement regarding Advanta's Corporate Finance Program (hereinafter "CFP Agreement") with clients such as G&P.  The stated purpose of the CFP Agreement was to "specify the manner in which Advanta's Corporate Finance Program will be conducted following the consummation of the [Purchase and Sale Agreement to Chase]."  [Id. ¶ 12.]  G&P alleges that in conjunction with the Advanta-Chase CFP Agreement, Advanta provided Chase with information regarding all third parties ("CFS Clients") from which Advanta had purchased pools of mortgages under its Corporate Finance Program.  In particular, G&P states that Advanta disclosed to Chase that G&P was an Advanta client and disclosed to Chase at least thirteen agreements between G&P and Advanta, including the Conduit Agreements.  [Id. ¶¶ 13-14.][4]

---

[4] Under the CFP Agreement between Chase and Advanta, Advanta agreed to indemnify Chase for claims on behalf of its clients (such as G&P), "except for any claims based upon [Chase's] negligence willful misconduct, bad faith, or any actions or omissions materially inconsistent with the Advanta CFP procedures."  The CFP Agreement also stated:

> The Advanta CFP procedures also include a practice of providing detailed information about loss mitigation activity and REO [Real Estate Owned] dispositions to Goodrich & Pennington Mortgage Fund, Inc. ('G&P') and other CFS Clients, of

G&P alleges that under the Advanta-Chase CFP Agreement, Chase again agreed to assume numerous obligations to Advanta clients, including G&P.  G&P states that Chase agreed to service loans, collect amounts due to Advanta, make payments to G&P, provide notices and reports and accounting to G&P, securitize the loans in the loan pools, and to only modify the Conduit Agreements with the consent of G&P.  [Id. ¶¶ 20-22.]

Thus, G&P argues that the Advanta-OCC Agreement, the Advanta-Chase Purchase and Sale Agreement, and the Advanta-Chase CFP Agreement demonstrate that Chase assumed all of Advanta's obligations to G&P.  G&P contends that by stepping into Advanta's shoes, Chase earned over two million dollars by collecting the securitization proceeds, servicing fees, and the amounts due from G&P's borrowers.  [Id. ¶¶ 22-23.]  G&P agrees that Chase forwarded it reports regarding the loan pools and loan securitization from March 1, 2001 to December 31, 2006.  However, G&P argues that Chase failed to abide by the Conduit Agreements since it did not distribute residual cash flow from the Trusts to G&P.  [Id. ¶ 26.]  G&P contends that by improperly taking control of the residual cash flow belonging to G&P, Chase "wrongfully kept for itself totals [of] $8,054,839.25."  G&P also states that Chase owes it $27,189,562.84 in "Residual Interest in Securitization."  [Id. ¶¶ 27-28.]

In sum, G&P alleges that: (1) Chase substituted Advanta with respect to the Conduit Agreements G&P initially made with Advanta, and (2) that Chase owes a duty to G&P to satisfy its unmet obligations under the Conduit Agreements.  [Id. ¶¶ 31-32.]  Accordingly, under the Second Amended Complaint, G&P is seeking relief from Chase for: (1) breach of express contract–third party beneficiary claim; (2) breach of implied-in-fact contract; (3) negligent impairment of collateral; (4) accounting; (5) declaratory relief; (6) promissory estoppel; (7) constructive trust/unjust enrichment; (8) interference with contractual relations; (9) intentional interference with prospective economic

---

consulting with G&P about such matters on a regular basis and of giving G&P certain approval rights over REO dispositions.  Purchaser [Chase] will use reasonable efforts to act consistently with such practices.
[Id. ¶¶ 29-30.]

1   advantage; and (10) negligent interference with prospective economic advantage.  [SAC.][5]

2

3                              **PROCEDURAL BACKGROUND**

4         On February 28, 2005, G&P initiated the present action in San Diego Superior Court.  [Doc.

5   No. 1.]  On March 30, 2005, Chase removed the case pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

6   [Id.]  On May 17, 2005, Chase moved under Rule 12(b)(6) to dismiss G&P's breach of contract and

7   conversion causes of action as alleged in G&P's verified complaint.  [Doc. No. 6.]  On March 6, 2006,

8   Judge Lorenz dismissed G&P's causes of action for breach of contract and conversion without

9   prejudice.  [Doc. No. 26.]  On August 7, 2006, G&P filed an amended complaint and on February 5,

10  2007, Judge Lorenz dismissed that complaint without prejudice.  [Doc. No. 57.]  On February 15,

11  2007, G&P filed a second amended complaint and Chase has now moved to dismiss that complaint

12  with prejudice.  [Docs. Nos. 59, 62.]

13

14                                 **LEGAL STANDARD**

15        A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the complaint. North Star

16  Int'l v. Arizona Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983).  Dismissal of the complaint or any

17  claim within it "can be based on the lack of a cognizable legal theory or the absence of sufficient facts

18  alleged under a cognizable legal theory."  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th

19  ─────────────────

20        [5]  Plaintiff also alleges in its complaint that:

21        CHASE has also failed and refused to comply with the mandatory arbitration clause
          contained within the LPCFA, even though G&P has requested that CHASE submit
22        this matter to binding arbitration before the American Arbitration Association.  As
          a result of CHASE's failure to submit to arbitration pursuant to the terms of the
23        LPCFA, G&P has had to expend significant time and money filing the instant
          lawsuit, and has been required to prosecute two separate actions: to arbitrate its claim
24        against Advanta, and to litigate its claim against CHASE.

25  [SAC ¶¶ 42, 43.]  The Court recognizes Ninth Circuit case law stating that nonsignatories
    and third party beneficiaries may be bound by arbitration agreements.  Comer v. Micor,
26  Inc., 436 F.3d 1098, 1100-1102 (9th Cir. 2006).  Accordingly, at oral argument, the Court
    asked Plaintiff's counsel whether he was in fact requesting this Court to compel
27  arbitration.  Plaintiff's counsel clarified that he was not making such a request; therefore
    the Court will not construe this portion of Plaintiff's complaint as a request to compel
28  arbitration.

                                      - 6 -                              05cv636

Cir. 1990).  See also Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).

In considering a motion to dismiss for failure to state a claim, the court accepts as true all material allegations in the complaint and construes those allegations, as well as the reasonable inferences that can be drawn from them, in the light most favorable to the plaintiff.  Hishon v. King & Spalding, 467 U.S. 69, 73, 104 (1984); Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 740 (1976); Love v. United States, 915 F.2d 1242, 1245 (9th Cir. 1989).  The court must resolve doubts in the plaintiff's favor.  Jenkins v. McKeithen, 395 U.S. 411, 421 (1969).  However, the court need not accept as true conclusory allegations, unreasonable inferences, or unwarranted deductions of fact.  Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).

For fifty years, courts have applied the Supreme Court's statement in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  See NOW, Inc. v. Scheidler, 510 U.S. 249, 256 (1994); Hishon, 467 U.S. at 73; Cervantes v. City of San Diego, 5 F.3d 1273, 1274-75 (9th Cir. 1993); Palmer v. Roosevelt Lake Log Owners Ass'n, 651 F.2d 1289, 1294 (9th Cir. 1981).  The Supreme Court recently determined that the "no set of facts" standard "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Bell Atl. Corp. v. Twombly, __U.S.__, 127 S. Ct. 1955, 1964, 1969 (2007).  Accordingly, to state a claim on which relief may be granted, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Id. at 1974.[6]

---

[6] Four days before oral argument on Defendant's motion, Defendant filed an ex parte motion for leave to file a memorandum regarding "new authority."  [Doc. No. 89.]  The new authority was Bell Atl. Corp. v. Twombly, __U.S.__, 127 S. Ct. 1955, 1964, 1969 (2007).  As Plaintiff notes, the Court was aware of Bell and has referenced the case in several opinions.  Therefore, the Court DENIES Defendant's ex parte motion.

**ANALYSIS**

**I.      The Law-of-the-Case Doctrine Does not Mandate this Court to Adopt Judge Lorenz's Prior Findings**

Judge Lorenz previously granted Defendant's motion to dismiss Plaintiff's breach of contract claims without prejudice.  Defendant argues that Plaintiff only made "cosmetic" changes to these claims in its second amended complaint, and that as a result, Judge Lorenz's ruling remains the "law of the case."  This Court disagrees.

Under the law-of-the-case doctrine, a court "is generally precluded from reconsidering an issue previously decided by the same court . . . in the identical case."  Lower Elwha Band of S'Klallams v. Lummi Indian Tribe, 235 F.3d 443, 452 (9th Cir. 2000) (citing Milgard Tempering, Inc. v. Selas Corp. of Am., 902 F.2d 703, 715 (9th Cir. 1990)).  However the Ninth Circuit has stated:

> The law of the case doctrine is not an absolute bar to reconsideration of matters previously decided. The doctrine merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.  Thus, the court may reconsider previously decided questions in cases in which there has been an intervening change of controlling authority, new evidence has surfaced, or the previous disposition was clearly erroneous and would work a manifest injustice.

Leslie Salt Co. v. United States, 55 F.3d 1388, 1393 (9th Cir. 1995) (internal citations and quotations omitted) (emphasis added); Ellis v. United States, 313 F.3d 636, 648 (1st Cir. 2002) (stating reconsideration of another judge's ruling is appropriate in the event of newly discovered evidence).

The Ninth Circuit has also acknowledged that:

> [I]nterlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge.  There is no imperative duty to follow the earlier ruling–only the desirability that suitors shall, so far as possible, have reliable guidance how to conduct their affairs.

Amarel v. Connell, 102 F.3d 1494, 1515 (9th Cir. 1996) (internal citations and quotations omitted). Thus, the law-of-the-case doctrine does not mandate this Court to adopt Judge Lorenz's prior findings. Moreover, Plaintiff has not made "cosmetic" changes to its amended complaint, but instead, has offered new facts and evidence, including the OCC Agreement and OCC Consent Order.  Therefore, the Court may properly deny Defendant's motion to dismiss without violating the doctrine.

**II.    G&P Has Adequately Pled a Cause of Action for Breach of Contract as a Third Party Beneficiary**

"A contract made expressly for the benefit of a third person may be enforced by him at any time before the parties thereto rescind it." Cal. Civ. Code § 1559.  However, just because the statute uses the term "expressly" does not mean that the contract must identify or refer to the third party by name.  Harper v. Wausau Ins. Co., 56 Cal. App. 4th 1079, 1086 (1997); COAC, Inc. v. Kennedy Engr's., 67 Cal. App. 3d 916, 920 (1977).  The contract need not be exclusively for the benefit of the third party.  Johnson v. Superior Court, 80 Cal. App. 4th 1050, 1064 (2000).  The third party may recover on the contract if it can show that it is a member of a class for whose benefit the contract was made.  Diamond Woodworks, Inc. v. Argonaut Ins. Co., 109 Cal. App. 4th 1020, 1042 (2003); Outdoor Servs., Inc. v. Pabagold, Inc., 185 Cal. App. 3d 676, 681-84 (1986); Garratt v. Baker, 5 Cal.2d 745, 748 (1936); Boliver v. Surety Co., 72 Cal. App. 3d Supp. 22, 27 (1977); 1 Witkin, Summary of Cal.Law (9th Ed; 1990) Contracts, § 666, p. 60.  Plaintiff must show an intent, clearly manifested by the contracting parties, to make the obligation inure to the benefit of the third party.  Schauer v. Mandarin Gems of California, Inc., 125 Cal. App. 4th 949, 957-58 (2005) (citing Sofias v. Bank of America, 172 Cal. App. 3d 583, 587 (1985)).

Generally, it is a question of fact whether a particular third person is an intended beneficiary of a contract.  Prouty v. Gores Technology Group, 121 Cal. App. 4th 1225, 1227 (2004).  Express intent to benefit a third party need not be manifested in the terms of the agreement; it can also be inferred from the circumstances of the agreement.  Such a determination involves a "construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered."  Neverkovec v. Fredericks, 74 Cal. App. 4th 337, 349 (1999) (internal citations omitted); Bancomer, S.A. v. Superior Court, 44 Cal. App. 4th 1450, 1458 (1996).

G&P has pled sufficient facts to support the allegation that Chase and Advanta intended to benefit G&P when they drafted the Purchase & Sale Agreement and the CFP Agreement.  G&P has also pled sufficient facts to show that the circumstances giving rise to those agreements infer that Chase assumed all of Advanta's rights and obligations pursuant to Advanta's agreements with G&P.

First, in the Advanta-Chase Purchase and Sale Agreement, it appears that Chase agreed to perform all of the obligations Advanta owed to its clients (such as G&P) under its Corporate Finance

Agreements.  The obligations included: making payments, servicing the loans, maintaining reserves, providing monthly reports, and maintaining confidentiality.  [SAC ¶ 11.]  While G&P was not specifically named in the Purchase and Sale Agreement, it was a member of a class for whose benefit the contract was made.  <u>Diamond Woodworks Inc.</u>, 109 Cal. App. 4th at 1042; <u>Outdoor Servs., Inc.</u>, 185 Cal. App. 3d at  681-84.

Second, in the Advanta-Chase CFP Agreement, the parties specified the manner in which Advanta's Corporate Finance Program would be conducted following the consummation of the Purchase and Sale Agreement.  As part of this agreement, Advanta disclosed to Chase that G&P was an Advanta client and disclosed the existence of thirteen agreements between G&P and Advanta, including the Conduit Agreements.  [<u>Id.</u> ¶¶ 13-14.]  Further, the CFP Agreement tracks the Purchase & Sale Agreement, since Chase again agrees to meet the same obligations to Advanta's clients (such as G&P).  The obligations included servicing the loans, maintaining reserves, making payments to clients, and providing reports and accounting.  [<u>Id.</u> ¶¶ 20-22.]  Thus, these agreements suggest an "intent, clearly manifested by the contracting parties [Chase and Advanta], to make the obligation[s] inure to the benefit of the third party [G&P]."  <u>Schauer</u>, 125 Cal. App. 4th at 957-58.

Finally, the OCC Agreement also states:

> Pursuant to the terms of this Purchase and Sale Agreement, Advanta Corporation has agreed to sell certain assets, including the real estate loans owned by the Bank as well as the Bank's ownership interests in certain residual assets, to Chase Mortgage.

[SAC ¶¶ 8-10.]  While Chase was not a party to this agreement, it still strengthens G&P's argument that: (1) the OCC pushed Advanta to exit the loan origination and secondary market, including servicing activities; (2) upon Advanta's exit of from this market, Advanta sold G&P's real estate loans and residual assets to Chase; and (3) as a result, Chase remains liable to G&P for Advanta's unmet contractual obligations to G&P in regards to those loans and residual assets.  [SAC ¶¶ 8-11.]  Therefore, the Court finds G&P has adequately stated a claim for relief for breach of contract under a third party beneficiary theory.

**III.     G&P Has Pled Sufficient Facts to Allege a Breach of an Implied-In-Fact Contract**

The essential elements of an implied-in-fact contract and an express contract are the same–mutual assent and consideration.  Chandler v. Roach, 156 Cal. App. 2d 435, 440, (1957).  California law holds that: "A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting."  Cal. Civ. Code. § 1589.  Consideration may be either a benefit conferred upon the promisor or a detriment suffered by the promisee.  Asmus v. Pacific Bell, 23 Cal. 4th 1, 31-32 (2000).

The essential difference between an implied contract and an express contract is the mode of proof.  When a contract is implied, the party asserting it must show conduct from which a promise may be inferred.  Foley v. Interactive Data Corp., 47 Cal. 3d 654, 675 (1988); Youngman v. Nevada Irrigation Dist., 70 Cal. 2d 240, 246 (1969); Chandler, 156 Cal. App. 2d at 440; Thompson v. California Brewing Co.,150 Cal. App. 2d 469, 473 (1957); see also Bush v. Lane, 161 Cal. App. 2d 278, 279 (1958) (stating that an implied contract can be inferred from "the conduct, situation, or mutual relations of the parties"); Del E. Webb Corp. v. Structural Materials Co., 123 Cal. App. 3d 593, 611 (1981) ("Whether or not an implied contract has been created is determined by the acts and conduct of the parties and all the surrounding circumstances involved and is a question of fact.").

In pleading a cause of action for an agreement implied from conduct, the plaintiff should allege the facts from which the promise is implied.  Youngman, 70 Cal. 2d at 246-47 (1969).  For example, in Kawasho Internat. (U.S.A.), Inc. v. Lakewood Pipe Service, Inc., 152 Cal. App. 3d 785, 789-91 (1983), the plaintiff established an implied-in-fact contract that pertained to interest owed on past-due accounts by showing a course of conduct between the parties, including the seller's acceptance of special interest invoices, partial payment of interest, the continued business relationship between the parties, and an indication by the seller that interest would be paid. See also id. at 791 ("The existence of an implied contract is a question of fact for the trial court[.]").

In the present action, G&P alleges a course of conduct from which a promise could be implied.  G&P alleges that: (1) Chase deposited funds in G&P's bank account as payments pursuant to its obligations under the Advanta-Chase Purchase and Sale Agreement and Advanta-Chase CFP

Agreement; (2) Chase sent G&P monthly loan pool and securitization reports for over five years; (3) Chase received a benefit by collecting G&P's monthly fees and service fees for over five years for loan servicing activities; (4) based on Chase's conduct and the agreements, G&P reasonably expected that Chase would remit to G&P shares of loan revenue and residual cash flow payments; and (5) Chase failed to remit such funds [SAC ¶¶ 45-50.] Thus, the Court finds that G&P has adequately alleged a cause of action for breach of an implied-in-fact contract.

**CONCLUSION**

For the foregoing reasons, this Court **DENIES** Defendant's motion to dismiss Plaintiff's first and second causes of action. The Court will rule on Defendant's motion to dismiss Plaintiff's remaining claims in due course.

IT IS SO ORDERED.

DATED: March 14, 2008

_Janis L. Sammartino_
Honorable Janis L. Sammartino
United States District Judge

05cv636